# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

### JEFFREY THELEN

*Plaintiff–Appellant,*

v.

### SOMATICS, LLC,

*Defendant–Appellee,*

Appeal from an Order of the United States District Court for the
Middle District of Florida, Case No. 8:20-cv-01724-TPB-JSS

## BRIEF OF DEFENDANT–APPELLEE
## SOMATICS, LLC

Susan J. Cole, BCS, EDF# 010171766
MG+M THE LAW FIRM
701 Brickell Avenue, Suite 2000
Miami, FL  33131
(305) 537-3419
scole@mgmlaw.com

Jonathan M. Freiman, EDF# 029184547
Ariela C. Anhalt, EDF# 532750818
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510
(203) 498-4400
jfreiman@wiggin.com
aanhalt@wiggin.com

*Attorneys for Defendant–Appellee Somatics, LLC*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. R. 26.1-1(a), Appellee submits this list which includes all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1. Abrams, Richard (Co-Owner of Somatics, LLC)

2. Alarcon, Monique (Attorney)

3. Anhalt, Ariela (Attorney)

4. Barber, Thomas P. (District Court Judge)

5. Benkner, Jason (Attorney)

6. Cole, Susan J. (Attorney)

7. Esfandiari, Bijan (Attorney)

8. Freiman, Jonathan M. (Attorney)

9. Hess, Tana (Court Reporter)

10. Jones, Bill (Court Reporter)

11. Lockwood, Rebekah (Court Reporter)

12. Manning Gross & Massenburg, LLP (firm)

13. Mirkovich, David (Manager of Somatics, LLC)

14. Nunn, Emma (Attorney)

15. Poole Shaffery (firm)

16. Schlein, Mark (Attorney)

17. Sneed, Julie S. (Magistrate Judge)

18. Somatics, LLC (Defendant-Appellee)

19. Swartz, Conrad (Co-Owner of Somatics, LLC)

20. Thelen, Jeffrey (Plaintiff-Appellant)

21. Wiggin and Dana LLP (firm)

22. Wisner Baum, LLP (firm)


Somatics, LLC is 50% owned by Richard Abrams, M.D., and 50% owned by Conrad Swartz, M.D. No publicly held corporation owns 10% or more of the stock of Somatics, LLC.

**STATEMENT REGARDING ORAL ARGUMENT**

Because the issues here are straightforward, Defendant-Appellee Somatics, LLC does not believe oral argument is warranted.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF CITATIONS ................................................................................ iv

STATEMENT OF THE ISSUES........................................................................1

STATEMENT OF THE CASE...........................................................................2

   I.   Procedural History .................................................................................2

   II.   Factual Summary ...................................................................................3

       A.   Psychiatric problems destroyed Plaintiff's life.........................3

       B.   Plaintiff tried ECT after signing a form warning of "mortality" and "permanent memory loss." ...........................................4

       C.   Trial evidence challenged Plaintiff's claim of neurocognitive injury.......6

       D.   Trial evidence challenged Plaintiff's claim that any injury resulted from ECT. ...........................................................6

       E.   The jury found no causation. ....................................................8

   III.   Standard of Review ..............................................................................8

SUMMARY OF THE ARGUMENT ..................................................................9

ARGUMENT ................................................................................................11

   I.   Exclusion of a video doesn't require a new trial. ..........................11

       A.   Plaintiff fails to show abuse of discretion. .............................12

       B.   Plaintiff cannot show prejudice. .............................................16

   II.   Exclusion of expert testimony doesn't require a new trial............17

       A.   The exclusion was proper. ......................................................18

B.      Plaintiff cannot escape the requirements of expert testimony................21

C.      Plaintiff cannot establish substantial prejudice. ....................................23

III.   Jury instructions don't justify a new trial....................................................24

IV.   Closing arguments don't justify a new trial. ................................................33

V.   The district court properly granted summary judgment on the design
        defect claim....................................................................................................36

A.      Lack of causation is fatal to the design defect claim.............................36

B.      The court's own case management order didn't prevent it from
          granting summary judgment. ...................................................................40

C.      Plaintiff's burden-of-production argument fails.....................................43

A.      Plaintiff failed to create a triable issue on the design defect claim. .......45

VI.   The district court properly merged the negligence claim. ..........................49

A.      Merger was proper. ...................................................................................49

B.      Lack of causation is fatal to the negligence claim..................................53

CONCLUSION ....................................................................................................55

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Adams v. G.D. Searle & Co.*,
    576 So. 2d 728 (Fla. Dist. Ct. App. 1991) .........................................................52

*Artistic Ent., Inc. v. City of Warner Robins*,
    331 F.3d 1196 (11th Cir. 2003) ...........................................................................43

*BankAtlantic v. Blythe Eastman Paine Webber, Inc.*,
    955 F.2d 1467 (11th Cir. 1992) ...........................................................................33

*Branham v. Ford Motor Co.*,
    390 S.C. 203 (2010) .....................................................................................52, 53

*Brinkley v. Pfizer, Inc.*,
    772 F.3d 1133 (8th Cir. 2014) .............................................................................28

*Brown v. NCL (Bahamas) Ltd.*,
    190 F. Supp. 3d 1136 (S.D. Fla. 2016) ...............................................................20

*Burley v. Kytec Innovative Sports Equip., Inc.*,
    2007 S.D. 82 ...............................................................................................52, 53

*Carlin v. Superior Ct.*,
    13 Cal. 4th 1104 (1996) .......................................................................................40

*Cates v. Zeltiq Aesthetics, Inc.*,
    73 F.4th 1342 (11th Cir. 2023) .....................................................................45, 46

*Cavanaugh v. Stryker Corp.*,
    308 So. 3d 149 (Fla. Dist. Ct. App. 2020) ....................................................40, 41

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................43, 44

*Centocor, Inc. v. Hamilton*,
    372 S.W.3d 140 (Tex. 2012) ...............................................................................28

*Chapman v. Procter & Gamble Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014) ................................................................20, 22

*Christopher v. Florida*,
449 F.3d 1360 (11th Cir. 2006) ........................................................34

*Clark v. Coats & Clark, Inc.*,
929 F.2d 604 (11th Cir. 1991) ........................................................43

*Cleveland v. Home Shopping Network, Inc.*,
369 F.3d 1189 (11th Cir. 2004) ..........................................................8

*Crawford v. ITW Food Equipment Group, LLC*,
977 F.3d 1331 (11th Cir. 2020) ........................................................45

*Davis v. Fla. Agency for Health Care Admin.*,
612 F. App'x 983 (11th Cir. 2015) ......................................................9

*Davoll v. Webb*,
194 F.3d 1116 (10th Cir. 1999) ........................................................23

*Dietz v. Smithkline Beecham Corp.*,
598 F.3d 812 (11th Cir. 2010) ........................................................27

*Doe v. Alpha Therapeutic Corp.*,
3 S.W.3d 404 (Mo. Ct. App. 1999) ....................................................31

*Doe v. Miles, Inc.*,
2000 WL 667383 (Mo. Ct. App. May 23, 2000)..............................................31

*Doe v. Princess Cruise Lines, Ltd.*,
657 F.3d 1204 (11th Cir. 2011) ........................................................26

*Ehlis v. Shire Richwood, Inc.*,
233 F. Supp. 2d 1189 (D.N.D. 2002), *aff'd*, 367 F.3d 1013 (8th
Cir. 2004) ................................................................................29

*Fane v. Zimmer, Inc.*,
927 F.2d 124 (2d Cir. 1991) ..........................................................52

*Freeman v. Hoffman-La Roche, Inc.*,
260 Neb. 552 (2000) ...................................... 11, 15, 25, 27-28, 38-39, 44, 48-54

*Gaghan v. Hoffman-La Roche Inc.*,
2014 WL 3798338 (N.J. Super. Ct. App. Div. Aug. 4, 2014) ............................28

*Garland v. Advanced Med. Fund, L.P. II*,
86 F. Supp. 2d 1195 (N.D. Ga. 2000) .................................................................41

*Glover v. Bausch & Lomb, Inc.*,
343 Conn. 513 (2022) .......................................................................................30

*Hallums v. Infinity Ins. Co.*,
945 F.3d 1144 (11th Cir. 2019) ...................................................................9, 36

*Hamilton v. Hardy*,
37 Colo. App. 375 (1976), *overruled by State Bd. of Med.*
*Examiners v. McCroskey*, 880 P.2d 1188 (Colo. 1994) ....................................30

*Hancock v. Paccar, Inc.*,
204 Neb. 468 (1979) .....................................................................................46, 52

*Haygood v. Auto-Owners Ins. Co.*,
995 F.2d 1512 (11th Cir. 1993) .......................................................................9, 12

*Hoelck v. ICI Americas, Inc.*,
7 Neb. App. 622, 624 (1998) .............................................................................52

*Hollis v. Birch*,
4 SCR 634 (1995) ...............................................................................................31

*Hubbard v. Bayer HealthCare Pharms. Inc.*,
983 F.3d 1223 (11th Cir. 2020) ....................................................................12, 26

*Ideus v. Teva Pharms. USA, Inc.*,
986 F.3d 1098 (8th Cir. 2021) ...........................................................................29

*Ins. Co. of N. Am. v. Valente*,
933 F.2d 921 (11th Cir. 1991) .............................................................................8

*Jay v. Moog Auto., Inc.*,
264 Neb. 875 (2002) ...............................................................................48, 51, 52

*Jefferson Fourteenth Assocs. v. Wometco de Puerto Rico, Inc.*,
695 F.2d 524 (11th Cir. 1983) .............................................................................51

*Kelleher v. Marvin Lumber & Cedar Co.*,
152 N.H. 813 (N.H. 2005) ..................................................................49

*Knight through Kerr v. Miami-Dade Cnty.*,
856 F.3d 795 (11th Cir. 2017) ....................................8, 12, 15, 18, 19

*Maiz v. Virani*,
253 F.3d 641 (11th Cir. 2001) ............................................18, 23, 24

*Mann v. Taser International, Inc.*,
588 F.3d 1291 (11th Cir. 2009) .........................................................42

*McCue v. Norwich Pharmacal Co.*,
453 F.2d 1033 (1st Cir. 1972)............................................................30

*McElroy v. Eli Lilly & Co.*,
495 F. App'x 166 (2d Cir. 2012) .................................................25, 27

*McElroy v. Firestone Tire & Rubber Co.*,
894 F.2d 1504 (11th Cir. 1990) .....................................................9, 25

*McHale v. Crown Equip.*,
2022 WL 4350702 (11th Cir. Sept. 20, 2022) ..................................15

*McWhorter v. City of Birmingham*,
906 F.2d 674 (11th Cir. 1990) ...........................................................34

*Norelus v. Denny's, Inc.*,
628 F.3d 1270 (11th Cir. 2010) .........................................................41

*O'Neil v. Somatics, LLC*,
2022 WL 4611938 (D.N.H. Sept. 30, 2022).....................................48

*Oladeinde v. City of Birmingham*,
230 F.3d 1275 (11th Cir. 2000) .........................................................25

*Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc.*,
984 F.2d 1118 (11th Cir. 1993) .........................................................33

*Patton v. Country Place Condo. Ass'n*,
2000 WL 33728374 (Ill. App. Ct. July 7, 2000) ...............................52

*Pitts v. Genie Indus.*,
302 Neb. 88 (2019) ......................................................................36, 37

*Plenger v. Alza Corp.*,
11 Cal. App. 4th 349 (1992) ......................................................28, 38

*Rahmig v. Mosley Machinery Co.*,
226 Neb. 423 (Neb. 1987) ................................................................46

*Rice-Lamar v. City of Ft. Lauderdale, Fla.*,
232 F.3d 836 (11th Cir. 2000) ........................................................44

*Salinero v. Johnson & Johnson*,
995 F.3d 959 (11th Cir. 2021) ........................................................27

*SEC v. Complete Bus. Sols. Grp., Inc.*,
608 F. Supp. 3d 1231 (S.D. Fla. 2022) ...........................................35

*In re Smith*,
231 B.R. 130 (Bankr. M.D. Ga. 1999) ............................................41

*Sowers v. R.J. Reynolds Tobacco Co.*,
975 F.3d 1112 (11th Cir. 2020) ......................................................14

*Sprint/United Mgmt. Co. v. Mendelsohn*,
552 U.S. 379 (2008) ........................................................................12

*Stahlecker v. Ford Motor Co.*,
266 Neb. 601 (2003) ...................................................................49, 53

*Sterling Drug, Inc. v. Cornish*,
370 F.2d 82 (8th Cir. 1966) ............................................................30

*In re Taxotere (Docetaxel) Prods. Liab. Litig.*,
994 F.3d 704 (5th Cir. 2021) ..........................................................28

*Tompkin v. Philip Morris USA, Inc.*,
362 F. 3d 882 (6th Cir. 2004) .........................................................37

*Transamerica Leasing, Inc. v. Inst. of London Underwriters*,
267 F.3d 1303 (11th Cir. 2001) ......................................................43

viii

*Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*,
   71 F.4th 894 (11th Cir. 2023) ................................................................22, 23

*Turner v. Am. Fed'n of Tchrs.*,
   138 F.3d 878 (11th Cir. 1998) ...................................................................9, 36

*Tutwiler v. Sandoz, Inc.*,
   726 F. App'x 753 (11th Cir. 2018) ..................................................................27

*U.S. Steel Corp. v. Astrue*,
   495 F.3d 1272 (11th Cir. 2007) ...............................................................47, 54

*U.S. v. Brooks*,
   460 F. App'x 903 (11th Cir. 2012) ..................................................................35

*U.S. v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) .......................................................................17

*U.S. v. Henderson*,
   409 F.3d 1293 (11th Cir. 2005) ...............................................................21, 23

*U.S. v. Hill*,
   643 F.3d 807 (11th Cir. 2011) .........................................................................35

*Valentine v. Baxter Healthcare Corp.*,
   68 Cal. App. 4th 1467 (1999) ..........................................................................52

*Varazo v. Keiser Corp.*,
   754 F. App'x 918 (11th Cir. 2018) ..................................................................38

*Vassallo v. Baxter Healthcare Corp.*,
   428 Mass. 1 (1998) ..........................................................................................52

*Viguers v. Philip Morris USA, Inc.*,
   837 A.2d 534 (2003), *aff'd*, 584 Pa. 120 (2005) ...........................................52

*Villegas v. Deere & Co.*,
   135 F. App'x 279 (11th Cir. 2005) ..................................................................52

*Vineyard v. Cty. of Murray*,
   990 F.2d 1207 (11th Cir. 1993) .......................................................................33

*Walker v. Soo Line R. Co.*,
  208 F.3d 581 (7th Cir. 2000) ...............................................................20

*Weese v. Schukman*,
  98 F.3d 542 (10th Cir. 1996) ...............................................................23

*Wells v. Gen. Dynamics Info. Tech. Inc.*,
  571 F. App'x 732 (11th Cir. 2014) .............................................41, 42

*Wendell v. GlaxoSmithKline LLC*,
  858 F.3d 1227 (9th Cir. 2017) ...........................................................27

*West v. Broderick & Bascom Rope Co.*,
  197 N.W.2d 202 (Iowa 1972) .............................................................52

*Williams v. Mast Biosurgery USA, Inc.*,
  644 F.3d 1312 (11th Cir. 2011) .........................................................21

*Willis v. Royal Caribbean Cruises, Ltd.*,
  77 F.4th 1332 (11th Cir. 2023) ...................................................37, 44

*Wilson v. Taser Int'l, Inc.*,
  303 F. App'x 708 (11th Cir. 2008) ....................................19, 21, 22

*Yellow Pages Photos, Inc. v. Ziplocal, LP*,
  795 F.3d 1255 (11th Cir. 2015) ....................................................9, 12

## Other Authorities

Fed. R. Evid. 403 ................................ 1, 5, 10, 12, 15, 16, 17

Fed. R. Evid. 701 ...................................................21, 22, 23

Fed. R. Evid. 702 ...............................................18, 21, 22, 23

Fed. R. Evid. 901 ...............................................................15, 16

Restatement (Third) of Torts Section 6(d)(2) .........................................29

## STATEMENT OF THE ISSUES

1.      Whether the district court properly exercised its broad discretion to exclude a duplicative video under Federal Rule of Evidence 403?

2.      Whether the district court properly exercised its broad discretion to limit testimony of an unqualified expert?

3.      Whether the district court properly gave a jury instruction requested by Plaintiff himself?

4.      Whether the district court properly declined to interrupt jury deliberations after Plaintiff belatedly objected to appropriate closing arguments?

5.      Whether the district court properly granted summary judgment on Plaintiff's unsupported design defect claim?

6.      Whether the district court properly applied Nebraska's merger doctrine to Plaintiff's negligence claim?

## STATEMENT OF THE CASE

## I.    Procedural History

Plaintiff-Appellant Jeffrey Thelen claimed he suffered a neurocognitive injury after his doctors administered electroconvulsive therapy ("ECT") using a medical device manufactured by Defendant-Appellee Somatics, LLC ("Somatics"). Dkt. 1.[1] Plaintiff brought counts that he broadly labeled as "negligence" and "strict liability," each jumbling together theories of design and warning defects. *Id*. at 20-25.[2]

After granting summary judgment on Plaintiff's design defect theory, Dkt. 169, the district court held a seven-day jury trial on Plaintiff's failure-to-warn theory. Recognizing that Nebraska law authorizes the "merger" of claims based on the same defect, the court declined to ask the jury to reach separate (and potentially inconsistent) findings about negligence and strict liability failure-to-warn. Dkt. 258 at 13-16; Dkt. 262 at 235. Instead, a verdict form asked whether (a) warnings were inadequate; and (b) the inadequacy caused Plaintiff injury. The jury ultimately held that, although warnings were inadequate, the inadequacy didn't cause Plaintiff injury. Dkt. 264 at 89.

---

[1] Somatics is a limited liability company with two members, citizen of Illinois and Washington. Dkt. 132.

[2] Unless otherwise indicated, this brief adds emphasis and omits internal citations, quotations, and alterations.

## II.    Factual Summary

### A.    Psychiatric problems destroyed Plaintiff's life.

Plaintiff suffers from mental disorders including recurrent major depression, leading him to repeatedly attempt suicide and self-harm.  Dkt. 260 at 195; Dkt. 262 at 162, 164, 171.  Plaintiff's "very long record of suicide attempts or bodily harm" includes incidents in which he slit his wrists, cut himself, jumped into traffic, stabbed himself, starved himself, and shot himself.  Dkt. 259 at 158-59, 166, 170, 174, 214; Dkt. 262 at 131-32, 134-35, 137, 162; *see, e.g.*, Dkt. 259 at 158-59 ("He took his handgun and…blew his finger off—or most of it.… [T]he doctor tried to put it together as best as he could….").

Substance abuse compounded these issues.  Plaintiff drank excessively, "abused opioids and cocaine," and took higher-than-necessary doses of prescription medication.  Dkt. 259 at 134, 138, 169, 209-10, 223; Dkt. 260 at 116, 129; Dkt. 261 at 71; Dkt. 263 at 67.  He was repeatedly hospitalized and admitted to rehabilitation facilities.  Dkt. 259 at 135, 138, 172, 214.

Plaintiff tried numerous medications and doctors, but nothing helped; he and his family concluded his condition was "untreatable."  Dkt. 259 at 136-37, 142, 165; Dkt. 261 at 200; Dkt. 262 at 135, 162, 169.  "[H]opeless" and with "thoughts of suicide," he moved in with his parents so they could "monitor" him.  Dkt. 262 at 170, 196.  He couldn't "get out of bed," "get [himself] showered," "eat," "work," or

"talk to people" without help.  Dkt. 259 at 142; Dkt. 262 at 196.  He became nonfunctional and "vegetative."  Dkt. 262 at 170.

Finally, one of Plaintiff's doctors recommended ECT.  Plaintiff and his family then desperately traveled hours away to a hospital that provided the treatment.  Dkt. 259 at 143-44; Dkt. 262 at 172-73.

> ### B. Plaintiff tried ECT after signing a form warning of "mortality" and "permanent memory loss."

Modern ECT—administered with a brief electrical dose and general anesthesia—is a "life-saving treatment" that is "very effective" for patients with severe mental health issues, including severe suicidal depression.  Dkt. 260 at 154, 208; Dkt. 263 at 16-17.  The "procedure is so straightforward today and so safe, that the majority of people can receive their… entire course of treatment as an outpatient."  Dkt. 263 at 17.

Somatics manufactures a prescription-only device that doctors use to administer ECT.  The device is *only* sold to hospitals and *only* used by medical professionals.  Dkt. 262 at 257.  Somatics "repeatedly" performs "safety tests" on each device prior to sale.  *Id.* at 23-24.  Somatics also provides *only* hospitals with a device manual, which states on its first page that ECT should exclusively be performed by doctors already "familiar with the medical literature concerning the risks, benefits, complications, and methods of ECT."  *Id.* at 25.  The manual

specifically instructs doctors to review a 2001 Task Force Report of the American Psychiatric Association, which describes ECT's risks. *Id*. at 26-27.

Between May 2014 and July 2016, multiple doctors gave Plaintiff one to two ECT treatments weekly, totaling about 95 treatments. Dkt. 260 at 97, 99. Plaintiff's doctors prescribed a "maintenance-type therapy... [t]o keep him stable in his depression and not killing himself." *Id*. at 182-83. One of these doctors, Dr. Arun Sharma, testified that Plaintiff experienced "remarkable improvement…out of his severe depression rates" following ECT. *Id*. at 198. Dr. Sharma continues to prescribe and administer ECT with Somatics' device. *Id*. at 207.

Before each treatment, Plaintiff signed a consent form provided by his doctor. Dkt. 111-2. The form warned Plaintiff that ECT could kill him and/or cause "permanent memory loss." *Id*. The form didn't use the words "brain damage."

Plaintiff testified that, if warned about "brain damage," he would've refused ECT. Dkt. 261 at 69, 108. But Plaintiff also testified he would've refused ECT if the form had warned of "permanent memory loss." *See* Dkt. 261 at 98 ("Q. If you had read a form and been told about permanent memory loss as a possible adverse effect to ECT, would you still have gone ahead and had ECT done? A. No."), even though it's undisputed that "permanent memory loss" *did* appear on the form he signed 95 times. *See* Dkt. 111-2. Plaintiff never reconciled that discrepancy. He did, however, admit he didn't recall reading the form. Dkt. 261 at 98.

**C.    Trial evidence challenged Plaintiff's claim of neurocognitive injury.**

At trial, Plaintiff claimed to have "dementia" and "permanent memory loss," which he characterized as "brain damage."   However, no doctor testified that Plaintiff had dementia.  Indeed, Plaintiff's own expert witness, Dr. Mark Hannappel, testified that Plaintiff did *not* have dementia.  Dkt. 262 at 155.  A neurologist agreed. *Id*. at 140; *accord* Dkt. 263 at 78 (dementia "explicitly ruled out").

Further, Somatics' expert Dr. Robert Bilder testified that neurocognitive testing confirmed Plaintiff did *not* have his claimed neurocognitive injury.  Dkt. 260 at 51, 58.   Plaintiff's intellectual functioning and ability scores—including in "memory functioning"—were within average ranges, indicating Plaintiff was "not impaired."  *Id*. at 38-46, 50.  Likewise, Somatics' expert Dr. C. Edward Coffey testified that Plaintiff's claimed injury was "not otherwise credible in the medical record."  Dkt. 263 at 74.  And Dr. Sharma—who treated Plaintiff for months after ECT—testified that Plaintiff's memory remained intact post-ECT.  Dkt. 260 at 203-05.

**D.    Trial evidence challenged Plaintiff's claim that any injury resulted from ECT.**

To the extent Plaintiff had *any* neurocognitive symptoms, trial evidence belied a causal relationship between these symptoms and ECT, identifying many more likely causes.  These included Plaintiff's extensive alcohol/drug abuse; his severe

depression; his history of multiple head injuries at a prior job; and a sleep condition that caused him to repeatedly stop breathing and lose oxygen to his brain. Dkt. 259 at 37, 210, 213, 216, 240; Dkt. 260 at 57, 196, 224; Dkt. 262 at 134-35, 138, 141, 167, 178-80; Dkt. 263 at 64-66, 68-69.

Plaintiff even admitted he wasn't sure if he'd had memory loss *before* ECT. Dkt. 261 at 101.  One of his treating physicians testified that, *prior* to ECT, Plaintiff had reported he "was unable to remember about 12 hours" after a suspected seizure. Dkt. 262 at 178.  The physician recommended a scan to assess potential causes of the memory loss, including seizure or cerebral hemorrhage, but Plaintiff refused.  *Id*. at 179-80.

Multiple medical professionals—including Dr. Bilder, Dr. Coffey, and Dr. Sharma—also testified that Plaintiff's claimed "brain damage" injury wasn't even a possible ECT side effect.  Dkt. 260 at 223-24; Dkt. 263 at 19, 30-31, 78-79.  By contrast, Plaintiff offered the testimony of Dr. John Read, who said ECT could cause "brain damage," as well as lasting memory loss at a rate between 12% and 55%. Dkt. 258 at 196, 228-29, 234.  Given that rate, Dr. Read deemed inadequate any warning characterizing the risk of permanent memory loss as "rare." *Id*. at 239.  But Dr. Read acknowledged other researchers disagreed with him.  Dkt. 259 at 46-47.

### E.     The jury found no causation.

The jury ultimately held that, while Somatics' warnings were inadequate, the inadequacy didn't cause Plaintiff injury.  Dkt. 246.  The verdict form didn't specify whether the jury had found Somatics' warnings inadequate (a) because they didn't warn of "brain damage" or (b) because they didn't warn that permanent memory loss was common rather than rare.  The verdict form did not ask the jury whether it found no causation because Plaintiff did not have the claimed injury, because the claimed injury was caused by something other than ECT (such as drug abuse), because Plaintiff would have undergone ECT regardless given his dire state, or for some other reason.  Plaintiff moved for a new trial, Dkt. 269, which the court denied, Dkt. 287.

## III.    Standard of Review

This Court "review[s] the district court's denial of a motion for new trial for abuse of discretion."  *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1196 (11th Cir. 2004).  A jury verdict must stand unless it "is against the clear weight of the evidence or will result in a miscarriage of justice."  *Ins. Co. of N. Am. v. Valente*, 933 F.2d 921, 922–23 (11th Cir. 1991).

The Court reviews evidentiary rulings for abuse of discretion.  *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 813 (11th Cir. 2017).  Any "errors must have affected substantial rights in order to provide the basis for a new trial,"

*Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1515 (11th Cir. 1993), which requires the movant to show the error "probably had a substantial influence on the jury's verdict," *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1275 (11th Cir. 2015).

The Court "review[s] a jury instruction deferentially." *Davis v. Fla. Agency for Health Care Admin.*, 612 F. App'x 983, 984 (11th Cir. 2015). Even if an instruction is erroneous, a party seeking a new trial must prove "prejudicial harm." *McElroy v. Firestone Tire & Rubber Co.*, 894 F.2d 1504, 1509 (11th Cir. 1990).

The Court reviews summary judgment grants *de novo*, *Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1148 (11th Cir. 2019), and "must affirm… if the result is correct even if the district court relied upon a wrong ground or gave a wrong reason," *Turner v. Am. Fed'n of Tchrs.*, 138 F.3d 878, 880 n.1 (11th Cir. 1998).

## SUMMARY OF THE ARGUMENT

Desperate to ease debilitating psychiatric symptoms, Plaintiff agreed to undergo ECT after signing a form warning it could literally kill him, or leave him with permanent memory loss. Plaintiff later sued, claiming that inadequate warnings led him to suffer a neurocognitive injury. But he was unable to prove that he even had this injury, that any symptoms resulted from ECT, or that different warnings would have changed his treatment decision. Plaintiff now claims he should have been able to recover on duplicative liability theories—all of which rest on warning

inadequacy, whether labeled "failure-to-warn," "design defect," or "negligence"—but he never could have, because a jury determined that inadequate warnings didn't cause any injury to Plaintiff.

Plaintiff offers several weak arguments regarding his "failure-to-warn" claim: First, he fixates on a 27-second video clip that merely duplicated other evidence and was properly excluded by the district court under Rule 403. Second, he objects to a reasonable limitation on expert testimony, asking this Court to ignore basic principles of the Federal Rules of Evidence. Third, he raises a meritless challenge to a jury instruction that *he* requested below. Fourth, he makes waived and meritless arguments about benign closing statement remarks. In all four instances, even if an error had occurred (which it didn't), Plaintiff can't show the prejudice needed to justify a new trial.

Plaintiff's challenge to the summary judgment ruling on his "design defect" claim fares no better. The argument fails because the absence of causation is just as fatal to the design defect claim as the failure-to-warn claim. Plaintiff's procedural arguments—involving a case management order and burden-shifting—torture Eleventh Circuit caselaw. Further, he cannot identify sufficient evidence to support the claim.

Nor can Plaintiff show error in the court's handling of his "negligence" claim. His argument fails because the absence of causation bars this claim too. Moreover,

the court properly declined to ask the jury to make separate (and potentially inconsistent) findings on negligence and strict liability.

Plaintiff broadly asks this Court to reject the "learned intermediary doctrine"—a decades-old pillar of Nebraska law that recognizes the value of scientific expertise and distinguishes between trained medical professionals and laypeople. *Freeman v. Hoffman-La Roche, Inc.,* 260 Neb. 552, 570 (2000). The doctrine, also recognized in every other U.S. state, rests on the principle that *only doctors* have the specialized medical training necessary to interpret highly-technical manufacturer warnings. Accordingly, a manufacturer of prescription products only must provide warnings to doctors, not patients. *See id.* ("[T]he duty to warn extends *only* to members of the medical profession *and not to the consumer*."). This Court must apply binding Nebraska precedent to Plaintiff's Nebraska-law claims.

## ARGUMENT

### I. Exclusion of a video doesn't require a new trial.[3]

Plaintiff argues the court erred by excluding a 2009-dated video (the "Video") and not reopening the record to admit it during jury deliberations. The Video shows healthcare providers—including, briefly, Dr. Sharma—discussing ECT. Plaintiff says a 27-second clip, when Dr. Sharma speaks three sentences, was relevant.

---

[3] Because the jury's causation determination on the failure-to-warn claim impacts the analysis of the design defect and negligence claims, this brief first addresses the failure-to-warn arguments.

Opening Brief ("OB") 56-57 (quoting Dkt. 269-2 at 9:43-10:10); *see* Dkt. 260 at 235 (seeking "to play a snippet" of "maybe a minute… if not less").[4]

Rule 403 authorizes exclusion of "relevant evidence" where "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. This Court reviews evidentiary rulings for abuse of discretion. *Knight*, 856 F.3d at 813. District courts have "wide discretion" especially "with respect to Rule 403, which requires on-the-spot balancing." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008). To justify a new trial, any "errors must have affected substantial rights," *Haygood*, 995 F.2d at 1515, meaning they "probably had a substantial influence on the jury's verdict," *Yellow*, 795 F.3d at 1275.

## A. Plaintiff fails to show abuse of discretion.

Plaintiff claims the Video bears on a potential defense "that Dr. Sharma already knew the full extent of the risks of ECT." OB55; *see, e.g.*, *Hubbard v. Bayer HealthCare Pharms. Inc*., 983 F.3d 1223, 1235 (11th Cir. 2020) (where a doctor already knows about a risk, failure to warn the doctor about that risk can't be the cause of injury). Plaintiff points to Dr. Sharma's 27-second statements that ECT's

---

[4] Plaintiff inaccurately cites these sentences as "9:43 *to 11:45*." OB57. The quote stops *at 10:10*. Somatics previously flagged the same inaccuracy. Dkt. 279 at 8 n.9.

"side effects include a recent memory loss in which a person is not able to remember what really had happened just prior to ECT" and there aren't "studies showing really any long-term memory problems." OB56-57. Plaintiff's argument fails because the video duplicates other evidence, lacks authentication, and risks undue delay, unfair prejudice, and jury confusion.

Any probative value was minimal—and substantially outweighed by risks of undue delay, time-wasting, and cumulative evidence—because the statements Plaintiff cites are duplicative of Dr. Sharma's already-admitted testimony, *e.g.*:

> A.… [Y]ou'll have trouble remembering things, *just what happened prior to the treatment and just after*.... [Lost information] can be *a few hours, a few days, and in some cases a few months*.... [W]e're always concerned about immediate, *recent*.... [P]atients sometimes have difficulty remembering things *around the ECT time*.... But to not remember… who am I? What's my name? How do I brush my teeth? I've not seen a case like that.…
>
> Q. Do you tell [patients] that in the years following ECT treatment, they would have periods of feeling confused as a result of treatment?
>
> A. Frankly, *I haven't seen cases like that*.… We tell them that *during the course of the treatment*, they're going to have spells like that.… *I don't see any reason why ECT would be causing that [years later]*.... *No, there's no evidence of*—.... *Not related to ECT.*
>
> Q. And if Somatics said to you, "We've conducted studies, and there is a serious risk of people feeling periods of confusion in the years following ECT because of the treatment", is that information you would tell the patient?
>
> A.… I would match it with my journals and colleagues and the experts *to see if they concur* with that, and then I would discuss with the patient. Frankly, *in 40 years of me doing it, I haven't even any case like that.*

13

Dkt. 260 at 161, 204-05, 220-21. While the Video doesn't mention "brain damage," Dr. Sharma already testified he doesn't "believe ECT causes" it and doesn't "talk about brain damage" with patients. *Id*. at 194, 218, 223-24.[5]

The Video also doesn't purport to exhaustively describe all risks known to Dr. Sharma (even in 2009); it urges patients to discuss further with their doctors. Dkt. 269-2 at 15:06. No single conversation encompasses the whole risk communication; risk communication occurs repeatedly, including for "about an hour" before the first ECT treatment, and is tailored to a particular patient's needs and questions. Dkt. 260 at 156-57, 169-170. The Video also cannot indicate the full warning information Plaintiff received because Dr. Sharma didn't give Plaintiff his first five treatments; the "information talk and question/answer session" occurred with *another* doctor before Dr. Sharma "came into the picture." Dkt. 260 at 178-79.

Authenticity issues also plagued the Video. Plaintiff didn't ask any witness to identify it. He cannot support the assertion that his "family watched" it. OB53. At trial, Plaintiff admitted he didn't recall watching any videos. Dkt. 261 at 70.[6] His mother mentioned seeing "a video" about ECT but couldn't identify it or recall its

---

[5] *See Sowers v. R.J. Reynolds Tobacco Co*., 975 F.3d 1112, 1124 (11th Cir. 2020) (probative value includes consideration of "evidentiary alternatives").

[6] In his deposition, Plaintiff said "[a]fter 2015" he saw "videos or movies about ECT," Dkt. 111-1 at 28, but didn't identify them. Plaintiff started ECT in 2014, Dkt. 260 at 97, so any such videos didn't influence his decision to begin treatment.

contents. Dkt. 259 at 144, 182. Dr. Sharma testified he "would not know" whether Plaintiff watched "any" video. Dkt 260 at 212. Dr. Sharma mentioned making a video but didn't identify it or say he only made one video; he mentioned multiple videos sometimes shown to patients, including one from Duke University. *Id*. at 170-71. The lack of identification justified exclusion under both Rule 403 and Rule 901. *See McHale v. Crown Equip*., 2022 WL 4350702, at *4 (11th Cir. Sept. 20, 2022) (videos not admissible "unless the proponent submits evidence sufficient to support a finding that the item is what the proponent claims it is.").

These deficiencies each justified exclusion, but the district court identified another: Nebraska (like all U.S. states) applies the "learned intermediary doctrine," under which a manufacturer of prescription products only has a duty to warn doctors, not patients. *Freeman,* 260 Neb. at 570 ("[T]he duty to warn extends *only* to members of the medical profession *and not to the consumer*."). Thus, the question was whether Somatics adequately warned Dr. Sharma, not whether Dr. Sharma adequately warned Plaintiff. The court recognized the Video risked confusing the jury on that distinction. Dkt. 261 at 93; *cf. Knight*, 856 F.3d at 813 (properly excluded evidence could confuse the jury about which purportedly-breached obligation was at issue).

That the deliberating jury asked to rehear Dr. Sharma's already-admitted testimony, which addressed numerous liability issues, doesn't eliminate any of the

above-discussed Rule 403 and Rule 901 problems with the Video. Plaintiff offers no caselaw supporting the suggestion that the district court abused its discretion by declining to confuse the jury with a new video during deliberations.[7]

### B. Plaintiff cannot show prejudice.

Even if the court had erred (which it didn't), Plaintiff cannot establish that the Video's admission would've changed the trial's outcome. Any relevance was minimal. Moreover, Plaintiff's claim rests on his belief that if the jury thought Dr. Sharma didn't know the risks of ECT, it would have found causation. But the jury could have found the causal chain broken in several completely independent ways:

- The jury could have found that Plaintiff would've undergone ECT regardless of warned risks, given his dire state: mental health issues so severe he'd repeatedly attempted suicide; couldn't get out of bed, shower, or eat without help; and all prior treatments, including medications and hospitalizations, had failed. Dkt. 259 at 134-38, 142, 166-67, 174; Dkt. 262 at 135. In fact, Plaintiff consented to ECT after signing a form warning of *death* and "permanent memory loss." Dkt. 111-2.[8]

---

[7] Plaintiff calls the Video a "medical business record," OB55, but identifies no authority exempting medical or business records from Rules 403 or 901.

[8] Plaintiff testified he didn't recall reading the form warnings, further indicating stronger warnings wouldn't have deterred him from treatment. Dkt. 261 at 98. He also testified he would've refused treatment if warned of a risk of "permanent

- The jury could have found that Plaintiff's claimed injury was caused by other things: his substance abuse, prior head injuries, prior seizure resulting in memory loss, sleep condition causing loss-of-oxygen to his brain, and severe depression. Dkt. 259 at 37, 210, 213, 216, 240; Dkt. 260 at 23, 57, 143, 196-97, 224; Dkt. 262 at 134-35, 138, 141, 167, 178-180; Dkt. 263 at 64-66, 68-69.

- The jury could have found that Plaintiff didn't even have his claimed injury, as he tested in normal ranges on neurocognitive tests and multiple experts deemed the injury medically implausible. Dkt. 260 at 38-45, 48-51, 194, 205; Dkt. 263 at 19.

Accordingly, Plaintiff can't prove harmful error in the Video's exclusion, even if it bore relevance to yet *another* break in the causal chain.

## II. Exclusion of expert testimony doesn't require a new trial.

Plaintiff next argues the district court improperly precluded Dr. Hannappel, a clinical neuropsychologist, from opining that ECT caused Plaintiff's claimed injury. This Court reviews for abuse of discretion, giving the district court "considerable leeway." *U.S. v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004). A new trial is

---

memory loss," but that phrase already appeared on the forms he signed 95 times. *Id*. The jury could easily have found Plaintiff non-credible.

inappropriate absent substantial prejudice. *Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001).

## A.     The exclusion was proper.

Exclusion was proper for multiple independently-sufficient reasons.

First, a proponent of expert testimony must establish "the expert is qualified to testify competently regarding the matters he intends to address." *Knight*, 856 F.3d at 808.   At his deposition, Dr. Hannappel testified he *wasn't* "qualified to offer medical causation opinions," Dkt. 142-7 at 7, and that "treatment with ECT is outside [his] scope of expertise," Dkt. 142-8 at 157.   He doesn't consider himself an expert on ECT generally, the side effects of ECT, the risks of ECT, or causation of neurocognitive abnormalities related to ECT.   Dkt. 142-8 at 161-162. He doesn't understand ECT enough to make any kind of treatment recommendations to patients. Dkt. 142-7 at 19.   He doesn't have any training or education on ECT or its cognitive effects.   *Id.* at 6-7. The extent of his ECT-related knowledge is he read "a couple of articles" regarding ECT in 2017.   *Id.* at 12.   He couldn't recall any specifics of those articles.   Dkt. 142-8 at 153.

Plaintiff argues Dr. Hannappel needn't be a medical doctor, or have used an ECT machine, to offer his excluded opinion. But he still must be "qualified as an expert by knowledge, skill, experience, training, or education."   Fed. R. Evid. 702.

And Dr. Hannapel admittedly lacks expertise on ECT's effects on human cognition. The court properly excluded the opinion for this reason alone.

Second, a proponent of expert testimony must establish "the methodology by which the expert reaches his conclusions is sufficiently reliable." *Knight*, 856 F.3d at 808. Dr. Hannappel simply took Plaintiff's history, during which Plaintiff reported "having memory problems which *[Plaintiff] attributed* to having ECT." Dkt. 142-7 at 28-29. Dr. Hannappel then concluded ECT likely caused Plaintiff's claimed symptoms "because [Plaintiff] seemed to have noticed a difference in his memory functioning after he had those treatments, *that was his report*." *Id*. at 43. Simply crediting Plaintiff's statements about causation, Dr. Hannappel didn't review *any* of Plaintiff's medical records. *Id*. at 21, 28. This approach left him unaware of Plaintiff's severe alcoholism: Plaintiff told Dr. Hannappel he didn't drink "that much," while medical records documented numerous alcohol-related hospitalizations. *Id*. at 42. At his deposition, Dr. Hannappel agreed alcoholism-related information would interest him in assessing memory-loss causation. *Id*. at 57-60. Overall, Dr. Hannappel's testimony failed to establish reliability. *Cf. Wilson v. Taser Int'l, Inc.*, 303 F. App'x 708, 714 (11th Cir. 2008) (unreliability where doctor "engaged in very few standard diagnostic techniques" to "rule out alternative causes" and couldn't adequately explain discounting a particular cause).

Plaintiff cites two out-of-jurisdiction cases in which courts allowed doctors to rely *in part* on patient histories. In both, doctors *also* used reliable methods beyond patient history, including extensive testing. *See Walker v. Soo Line R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000); *Brown v. NCL (Bahamas) Ltd.*, 190 F. Supp. 3d 1136, 1144 (S.D. Fla. 2016). This caselaw also acknowledges "[t]here may be cases in which a patient's self-reported history is so patently misleading as to make it unreasonable for an examining physician to place any reliance on it." *Walker*, 208 F.3d at 587 n.3. Here, Plaintiff failed to disclose his lengthy history of hospitalizations/treatment for severe alcoholism and told Dr. Hannappel he didn't drink that much. This history is so patently misleading as to make it unreasonable for Dr. Hannappel to rely on it when ruling out the possibility that alcohol use caused Plaintiff's claimed injury.

Plaintiff claims Dr. Hannappel conducted a "differential diagnosis." But "[a] reliable differential analysis requires an expert to compile a comprehensive list of hypotheses that might explain a plaintiff's condition," then "provide reasons for rejecting alternative hypotheses using scientific methods and procedures." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1310 (11th Cir. 2014). Dr. Hannappel didn't even engage in sufficiently thorough analysis to compile a comprehensive list of alternate causes (*e.g.*, alcoholism), let alone identify specific reasons based on scientific methods and procedures to rule out those causes.

Plaintiff also argues Dr. Hannappel "read medical literature on ECT." OB49. But vague references to reading materials he couldn't remember plainly cannot establish a reliable analysis of the extensive body of medical literature on ECT. The court was well within its broad discretion in finding insufficient evidence of a reliable methodology.

### B.    Plaintiff cannot escape the requirements of expert testimony.

Plaintiff proposes that the court must permit Dr. Hannappel to give a causation opinion *without* adequate qualifications or reliable methods because Dr. Hannappel was one of Plaintiff's treating physicians and therefore testifying as a lay witness rather than an expert. OB41. That argument fails for two reasons.

First, a treating physician's opinion on causation must satisfy requirements for expert testimony where that opinion isn't essential to the physician's treatment decisions. *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1318 (11th Cir. 2011); *U.S. v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005); *Wilson*, 303 F. App'x at 712-13. Plaintiff hasn't established that Dr. Hannappel rendered his causation hypothesis as a necessary part of Plaintiff's treatment.

Second, Rule 701 prohibits lay opinions "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. A determination that a particular medical procedure caused a particular neurocognitive injury requires a physician's specialized scientific knowledge; no ordinary layperson

could make that determination. That Dr. Hannappel is a *treating* physician doesn't change the calculus: "A treating doctor is providing expert testimony if the testimony consists of opinions based on scientific, technical, or other specialized knowledge *regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation*." *Chapman*, 766 F.3d at 1316 n.23.

This Court recently clarified it has "not held that any treating physician can testify as a lay witness about any diagnosis she made while treating the patient." *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 71 F.4th 894, 908 n.9 (11th Cir. 2023). Instead, the Court has drawn a critical distinction to preserve the boundaries of Rule 701: A treating physician may testify about a diagnosis that does not require "complex diagnostic reasoning," such as the existence of "a broken jaw" or "coughing and running a fever"; but, for example, "if the physician also testifies that he diagnosed the patient as having Reactive Airways Dysfunction Syndrome *caused by exposure to a toxic chemical*, then this is testimony based on scientific, technical, or other specialized knowledge and must be qualified under Rule 702." *Id*. Dr. Hannappel's opinion that ECT caused a neurocognitive injury plainly requires "complex diagnostic reasoning."

Plaintiff ironically cites two decisions spelling out this very distinction—that a treating physician may testify as a lay witness about the existence of a simple injury but may not hypothesize as a lay witness about its cause. *See Wilson*, 303 F. App'x

at 712-13 (testifying as a layperson, a treating physician could give a "diagnosis of the injury itself—that [plaintiff's] spine was fractured" but couldn't give his "hypothesis" on "the cause of the injury"); *accord Henderson*, 409 F.3d at 1300 (testifying as a layperson, a treating physician could state "that [the plaintiff's] jaw was fractured" but couldn't make a "statement about the cause of the injury").

Plaintiff also asks this Court to apply two Tenth Circuit decisions—*Davoll v. Webb*, 194 F.3d 1116 (10th Cir. 1999), and *Weese v. Schukman*, 98 F.3d 542, 550 (10th Cir. 1996). But this Court has already explicitly dismissed both as "predat[ing] the 2000 amendment to Rule 701," stressing "that trial courts must be vigilant in ensuring that the reliability requirements set forth in Rule 702 are not 'evaded through the simple expedient of proffering an expert in lay witness clothing.'" *Travelers*, 71 F.4th at 908 n.9 (quoting Fed. R. Evid. 701 advisory committee note to 2000 amendment).

### C. Plaintiff cannot establish substantial prejudice.

Even had an error occurred (which it didn't), Plaintiff cannot show "a substantial prejudicial effect from the ruling," *Maiz*, 253 F.3d at 667, because Plaintiff's expert Dr. Bennet Omalu repeatedly gave the exact opinion the Court barred Dr. Hannappel from offering: that ECT caused Plaintiff's claimed injury. *See* Dkt. 260 at 114-15 ("I made a determination... of a substantial and significant factor that caused his brain damage.... Multiple electroconvulsive therapies...."); *id.* at 151-

52 ("A.…[Plaintiff] was exposed to 95 electroshocks and developed brain damage…. Q. As a result of the ECT? A. Yes….").

Moreover, the exclusion of Dr. Hannappel's opinion also couldn't have affected the trial's outcome because Somatics offered extensive evidence of other broken links in the causal chain—including, as discussed above, that Plaintiff didn't even have his claimed injury and that Plaintiff, in his desperate condition, would've chosen ECT regardless of risks. *See supra* Section I(B).

Lastly, Plaintiff cannot show any "substantial prejudicial effect" because his counsel actually *disregarded and violated* the district court's order and presented Dr. Hannappel's excluded opinion to the jury. While questioning a different witness (Dr. Coffey) in front of the jury, Plaintiff's counsel stated: "[T]his is a progress note from Dr. Hannappel.... [Dr. Hannappel] writes... '[Plaintiff] lost his memory in 2015 *because of ECT*.'" Dkt. 263 at 111 (emphasis added). Somatics immediately objected, but the court didn't tell the jury to disregard this statement. *Id*. Plaintiff cannot show any harm in an order excluding an opinion that his counsel ensured the jury heard anyway.

## III.    Jury instructions don't justify a new trial.

Plaintiff also challenges the jury instruction that, "[i]n order to prove that inadequate instructions or warnings proximately caused [Plaintiff's] injury, [Plaintiff] must prove that his prescribing physician would have altered his conduct

had adequate warnings and instructions been provided." Dkt. 263 at 163. A district court has "wide discretion over [instructions'] style and wording," *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1296 (11th Cir. 2000), and even an erroneous instruction won't justify a new trial absent "prejudicial harm," *McElroy*, 894 F.2d at 1509.

The district court gave the instruction *at Plaintiff's request* after resolving a dispute *in Plaintiff's favor*: As discussed above, under the learned intermediary doctrine, "a [medical] manufacturer's duty to warn... extends only to members of the medical profession and not to the consumer." *Freeman*, 260 Neb. at 570.[9] Below, the parties disputed how a plaintiff must show that a failure to warn Plaintiff's doctor caused his injury. Somatics argued that causation requires evidence that a stronger warning would change the doctor's "prescription decision." Dkt. 261 at 227-30.[10] Plaintiff argued for a broader standard, requiring only evidence that a stronger warning would change the doctor's "conduct." Dkt. 262 at 231. Plaintiff prevailed,

---

[9] *Accord* Dkt. 262 at 221 ("THE COURT: And who are you allowed to argue the warning should have gone to?... [PLAINTIFF'S COUNSEL]: To his doctors….").

[10] Somatics maintains that position. *See McElroy v. Eli Lilly & Co.*, 495 F. App'x 166, 167-68 (2d Cir. 2012) (under Nebraska law, to prove causation, plaintiff must prove his doctors would've "altered their prescription decisions if... provided different warnings"). But if the instruction erred by not adopting Somatics' prescription-decision position, the error didn't prejudice Plaintiff: it *decreased* his burden.

but still couldn't convince the jury on causation. He now belatedly argues that his own requested standard was incorrect.

Plaintiff waived any argument that the "conduct" standard is improper by requesting it. *See, e.g.*, Dkt. 262 at 231 ("[T]he correct standard, Your Honor, is the conduct."); Dkt. 261 at 223 ("Your Honor has it correct, that it's conduct."); *id.* at 232 ("[I]t's the conduct of the physician that matters.... The conduct matters...."); *id.* at 225-26 ("THE COURT:... [Y]ou've got [to prove] that the doctor in this case would have mentioned this to the patient... [PLAINTIFF'S COUNSEL]: I agree...."). Invited errors are waived. *See Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1213 (11th Cir. 2011).[11]

Moreover, even if the argument weren't waived, it's meritless. The instruction correctly stated that, under Nebraska law, Plaintiff can't establish causation without proof that a stronger warning would at least impact his doctor's conduct. This Court has consistently held, when considering failure-to-warn claims against medical manufacturers under the law of *any* state, that a plaintiff must prove causation through evidence of how a stronger warning would have affected the doctor's conduct. *See Hubbard*, 983 F.3d at 1225 ("[A] plaintiff claiming a

---

[11] Plaintiff notes he objected to Somatics' proposed prescription-decision instruction. *See* OB32 (citing Dkt 177 at 73-74; Dkt. 262 at 229-231, 233-235). But he repeatedly told the court the conduct standard was the "correct" way to address his objections to the prescription-decision standard. Dkt. 261 at 223, 225-26, 232; Dkt. 262 at 231.

manufacturer's warning was inadequate bears the burden of establishing that an improved warning would have caused her doctor not to prescribe her the drug in question."); *accord Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 816 (11th Cir. 2010); *Salinero v. Johnson & Johnson*, 995 F.3d 959, 961–62 (11th Cir. 2021). The Second Circuit has reached the same conclusion applying Nebraska law. *See McElroy*, 495 F. App'x at 167-68 (2d Cir. 2012) (to prove causation, a plaintiff must prove his doctors would've "altered their prescription decisions if... provided different warnings").

This Court recently rejected Plaintiff's same argument "that the learned intermediary doctrine does not apply" if the manufacturer "did not adequately warn" the doctor, recognizing that this ignores the "separate requirement" under the doctrine that a plaintiff must also establish "proximate causation—that [the doctor] would not have prescribed" with a stronger warning. *Tutwiler v. Sandoz, Inc.*, 726 F. App'x 753, 757 (11th Cir. 2018); *accord, e.g.*, *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1238 (9th Cir. 2017) ("[Plaintiff] must prove *not only* that no warning was provided or the warning was inadequate, *but also* that the inadequacy or absence of the warning caused the plaintiff's injury.").

Plaintiff identifies nothing in *Freeman v. Hoffman-La Roche, Inc.*, 260 Neb. 552 (2000), that eliminates his causation burden. *Freeman* confirmed that the learned intermediary doctrine applies in Nebraska (as in every U.S. jurisdiction).

Other jurisdictions agree that causation focuses on whether a stronger warning would have affected the doctor's decision-making. *See, e.g.*, *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 172 (Tex. 2012); *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 994 F.3d 704, 708-09 & n.4 (5th Cir. 2021); *Brinkley v. Pfizer, Inc.*, 772 F.3d 1133, 1138 (8th Cir. 2014).

Contrary to Plaintiff's suggestion on appeal, no language in *Freeman* states that a manufacturer who fails to satisfy its duty to warn a physician acquires a new duty to warn a patient directly. *Cf. Freeman,* 260 Neb. at 570 (duty to warn extends "only" to the doctor "and not to the consumer"). As other courts have explained, there is no duty to warn the patient directly because:

> (1) The doctor is intended to be an intervening party in the full sense of the word. Medical ethics as well as medical practice dictate independent judgment, unaffected by the manufacturer's control, on the part of the doctor. (2) Were the patient to be given the complete and highly technical information on the adverse possibility associated with the use of the drug, he would have no way to evaluate it, and in his limited understanding he might actually object to the use of the drug, thereby jeopardizing his life. (3) It would be virtually impossible for a manufacturer to comply with the duty of direct warning, as there is no sure way to reach the patient.

*Plenger v. Alza Corp.*, 11 Cal. App. 4th 349, 362 (1992); *accord Gaghan v. Hoffman-La Roche Inc.*, 2014 WL 3798338, at *12 (N.J. Super. Ct. App. Div. Aug. 4, 2014).

Equally unsupported is Plaintiff's suggestion that the learned intermediary doctrine, which defines the duty at issue, is irrelevant to causation. *Freeman* says nothing of the kind, nor could it: Because causation is a relationship between a

breach of a specific duty and a claimed injury, a court must consider the *correct* duty—here, as defined by the doctrine, a duty to warn "only" the doctor—when considering how a plaintiff must show that a breach of that duty caused injury.

Plaintiff points to Section 6(d)(2) of the Restatement (Third) of Torts, which states that a medical manufacturer must warn a patient directly if "the manufacturer knows or has reason to know that health-care providers will not be in a position to reduce the risks of harm in accordance with the instructions or warnings."  OB35. But, as Comment E to the Restatement explains, Section 6(d)(2) only applies to limited contexts in which "drugs... are dispensed or administered to patients *without* the personal intervention or evaluation of a health-care provider," such as "the administration of a vaccine in clinics where mass inoculations are performed." Section 6(d)(2) does *not* apply where a physician personally prescribes a product to an individual patient.  *See, e.g.*, *Ideus v. Teva Pharms. USA, Inc.*, 986 F.3d 1098, 1101 (8th Cir. 2021) (under Nebraska law, when physicians personally prescribe a product, this "fits within the rationale for the rule: they will be 'in the best position to' advise their patients about the risks of using it").[12]  Here, Plaintiff received ECT through a personalized consultation with Dr. Sharma, not any kind of mass treatment program, so Section 6(d)(2) is inapplicable.

---

[12] *See also Ehlis v. Shire Richwood, Inc.*, 233 F. Supp. 2d 1189, 1196 n.3 (D.N.D. 2002), *aff'd*, 367 F.3d 1013 (8th Cir. 2004).

Plaintiff also erroneously relies on out-of-jurisdiction cases that stress the importance of evidence of an impact on doctors' conduct. *See Hamilton v. Hardy*, 37 Colo. App. 375, 387 (1976) (stressing "evidence from which the jury could have found that" an "inadequate warning... contributed to [the doctor's] continued prescription"; a "doctor's conduct may not insulate the manufacturer from liability where the inadequacy of the warning may have contributed to plaintiff's injury"), *overruled by State Bd. of Med. Examiners v. McCroskey*, 880 P.2d 1188 (Colo. 1994); *McCue v. Norwich Pharmacal Co.*, 453 F.2d 1033, 1035 (1st Cir. 1972) (finding it "likely" a warning would've changed a doctor's prescription decision; emphasizing the importance of whether inadequate warnings "may have contributed" to the doctor's behavior); *see also Glover v. Bausch & Lomb, Inc*., 343 Conn. 513, 539 & n.16, 543 (2022) (deeming "persuasive" out-of-jurisdiction authority requiring plaintiff to "demonstrate that the warning was inadequate and that the failure to adequately warn of the dangers was *a proximate cause of* his or her injuries"; reasoning that the learned intermediary doctrine isn't "a shield against liability for foreseeable injuries *caused by* the withholding of information" and a factfinder must determine if a "*causal relationship*" exists (emphasis altered)). Plaintiff further errs in relying on the Eighth Circuit's 1966 *Erie* guess on Missouri law in *Sterling Drug, Inc. v. Cornish*, 370 F.2d 82 (8th Cir. 1966). Following that guess, Missouri appellate courts explicitly confirmed that causation requires

evidence of a change in doctor conduct. *See Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d 404, 420 (Mo. Ct. App. 1999); *Doe v. Miles, Inc.*, 2000 WL 667383, at *12 (Mo. Ct. App. May 23, 2000).

Lacking support under U.S. law, Plaintiff invokes a thirty-year-old Canadian decision applying Canadian law, *Hollis v. Birch*, 4 SCR 634 (1995), a split decision never followed by any U.S. jurisdiction. If U.S. and Canadian laws differ on this issue, it may be because of a distinctive element of Canadian law that Plaintiff ignores: Canada's "loser pays" rule, requiring where unsuccessful plaintiffs pay defendants' litigation costs, deterring the filing of weak tort claims. This rule may make the learned intermediary doctrine's protections for medical manufacturers less important, because a vital safeguard for medical manufacturers *already exists* in Canada to prevent a deluge of tort claims that would cripple the medical manufacturer industry and hinder patient access to life-saving treatment.

Plaintiff further stresses that, under Nebraska law, there are contexts in which "the active negligence of a third person" can't shield a defendant. OB38. That argument misses the mark. Somatics has never argued that Plaintiff's doctor (a third person) acted negligently at all, let alone that his negligence excused anyone else's. (Indeed, Somatics expressly argued to the jury: "Dr. Sharma didn't do anything wrong." Dkt. 264 at 53.) Requiring evidence that a stronger warning would've changed a doctor's conduct has nothing to do with finding the doctor negligent; it

simply requires a plaintiff to prove that any failure by a manufacturer to satisfy its duty to warn the doctor actually caused the claimed injury.

Finally, Plaintiff cannot show that any instructional error harmed him. As discussed above, the jury could've found the causal chain broken in several ways having nothing to do with whether a stronger warning would have changed Dr. Sharma's conduct. As discussed above, it could have found that (a) Plaintiff was in such a desperate state that he would've undergone ECT regardless of risks; (b) factors other than ECT— including excessive alcohol use, severe depression, prior head injuries, and a sleep condition causing Plaintiff to lose oxygen to his brain—caused any symptoms; and (c) Plaintiff didn't even have his claimed injury. *See supra* Section I(B). Because the jury could've reasonably found any or all of these, Plaintiff cannot show that any error in the instruction constituted harmful error.

That the jury asked "questions... related to Dr. Sharma" during deliberations, OB39, doesn't mean the verdict rested on a belief that a stronger warning would not have affected Dr. Sharma's conduct. The jury asked to rehear testimony bearing on multiple issues in the case, including the adequacy of warnings and the other causal chain breaks discussed above. *See, e.g.*, Dkt. 245 at 4 (jury request to rehear testimony pertaining to "whether ECT causes permanent and/or temporary loss of memories," an issue relevant to both warning inadequacy and causation).

**IV. Closing arguments don't justify a new trial.**

Plaintiff argues that the district court improperly declined to set aside the verdict based on counsel comments during closing arguments. Courts "should be reluctant to set aside a jury verdict because of an argument made by counsel during closing arguments," *Vineyard v. Cty. of Murray*, 990 F.2d 1207, 1213 (11th Cir. 1993), and should not disturb a verdict unless the comments "impair[ed] gravely the calm and dispassionate consideration" of the jury, *BankAtlantic v. Blythe Eastman Paine Webber, Inc*., 955 F.2d 1467, 1474 (11th Cir. 1992).

Plaintiff's argument fails for multiple independent reasons:

<u>First</u>, Plaintiff cannot obtain a new trial based on closing arguments because, while he "now claim[s] severe prejudice," he "made no attempt to object to the arguments when they were made," depriving the Court of a chance to consider a swift curative instruction. *Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc*., 984 F.2d 1118, 1129 (11th Cir. 1993). Not until hours into deliberations did Plaintiff first complain that defense counsel had "used the word prescribed" during closings. *See* Dkt. 264 at 73-74 ("[Y]ou didn't object at the time. That's ancient history.").

Plaintiff cites no decision where this Court has found an abuse of discretion by a district court denying a motion for a new trial based on a closing argument to which there was no contemporaneous objection. Instead, Plaintiff cites decisions

*affirming* trial court exercises of discretion on new trial motions based on closing arguments. *See McWhorter v. City of Birmingham*, 906 F.2d 674, 677 (11th Cir. 1990) (noting the considerable deference given to trial court rulings on new trial motions relying "on prejudicial conduct or pernicious behavior" because a trial judge can best "determine whether the proceeding has been 'contaminated' by events," and finding no abuse of discretion); *see also Christopher v. Florida*, 449 F.3d 1360, 1368 (11th Cir. 2006) (affirming trial court's discretionary grant of new trial where counsel violated numerous orders during closings and, when threatened by court with contempt, responded "so be it").

Second, Somatics' closing contained no improper statements. It tracked the court's causation instruction, explaining not only that Plaintiff had failed to prove that Dr. Sharma would not have prescribed ECT to Plaintiff but also, more broadly, that Plaintiff had failed to prove "that Dr. Sharma would have *changed his conduct* in prescribing ECT." Dkt. 264 at 67. Even if causation turns on a doctor's conduct broadly, the prescription decision is still one relevant kind of conduct. Pointing out that Plaintiff failed to prove a change in that conduct was appropriate.

Third, even if the defense closing had contained some misstatement of the causation standard (which it didn't), Plaintiff cannot show harm, because the Court gave clear proximate causation instructions to the jury, Dkt. 263 at 163, and repeatedly instructed the jury that it would instruct on the law and that lawyers'

arguments "aren't evidence," Dkt. 258 at 157, 160, and that "anything the lawyers say...isn't binding on you," Dkt. 263 at 166-67.[13] Courts "presume that jurors follow their instructions," and the trial court's clear instructions thus preclude a finding of harmful error. *U.S. v. Hill*, 643 F.3d 807, 829 (11th Cir. 2011).[14]

Fourth, Plaintiff also cannot establish that any error caused him harm because substantial evidence supports the verdict. Plaintiff doesn't (and can't) establish that the record lacks sufficient evidence to support a jury determination of a broken causal chain. *See supra* Section I(B); *see also U.S. v. Brooks*, 460 F. App'x 903, 905 (11th Cir. 2012) (closing misstatement of law harmless where "ample evidence" supported verdict); *SEC v. Complete Bus. Sols. Grp., Inc.*, 608 F. Supp. 3d 1231, 1249 (S.D. Fla. 2022) ("unobjected to statement" in closing doesn't undermine trial's fairness where "multiple other pieces of evidence" supported verdict).

---

[13] *See also* Dkt. 258 at 159 ("*I will give you a detailed explanation on the law* you must apply in deciding this case. After that, the lawyers will present their closing arguments to summarize and interpret the evidence for you. *I will then give you one final instruction on the law*…."); Dkt. 263 at 166 (similar); Dkt. 263 at 162 (similar); Dkt. 258 at 105 (similar); Dkt. 258 at 90 (similar); Dkt. 264 at 19 ("The attorneys will now present their closing arguments. Keep in mind that what you are about to hear is not evidence.").

[14] In his own closing, Plaintiff told the jury that the causation standard only required him to "demonstrate... that had... Somatics issued warnings to Dr. Sharma, that Dr. Sharma would have relayed those warnings, and armed with those warnings, Mr. Thelen and his family would have rejected ECT." Dkt. 264 at 35. Plaintiff does not explain why the jury should be presumed to have ignored his own statement and the court's instructions.

Fifth, Plaintiff's own closing misstated the law on causation to skew the standard in his favor: his counsel told the jury (over Somatics' *contemporaneous* objection) that it had to find for Plaintiff if even a "thought" that there might be causation "crosse[d jurors'] minds." Dkt. 264 at 22. The preponderance standard requires a jury to find causation is more likely than not; a thought crossing jurors' minds isn't enough. If the jury were presumed to ignore the court's instructions and follow closings, Plaintiff's closing gave him an improperly *low* causation burden.

## V. The district court properly granted summary judgment on the design defect claim.

Plaintiff also argues that the district court erred in granting summary judgment on the design defect claim. The Court reviews summary judgment grants *de novo*, *Hallums*, 945 F.3d at 1148, and affirms "if the result is correct even if the district court relied upon a wrong ground or gave a wrong reason," *Turner*, 138 F.3d at 880 n.1.

### A. Lack of causation is fatal to the design defect claim.

This Court need not address Plaintiff's arguments regarding his design defect claim because the jury's causation determination is fatal to the claim.

To prove a design defect claim, a plaintiff must prove that a defect rendered the product "unreasonably dangerous," meaning it "has a propensity for causing physical harm beyond that which could be contemplated by the ordinary user or consumer." *Pitts v. Genie Indus.*, 302 Neb. 88, 99 (2019). Critically, the plaintiff

must also prove the defect was the "proximate cause" of his claimed injury. *Id.* at 99-100.

Here, the *only* design defect in Plaintiff's complaint is that Somatics marketed the device without adequate warnings. Dkt. 1 ¶¶ 3, 40, 50, 52-54, 57, 59-60, 68, 76; *see* Dkt. 100 at 26 (arguing that the design defect claim satisfied Nebraska's user-expectations test because Plaintiff "was not adequately informed of… risks").[15] But the jury concluded that, while Somatics' warnings were inadequate, *that inadequacy did not cause any injury to Plaintiff.* Dkt. 246. Even if Plaintiff had been allowed to frame his warning inadequacy claim as a design defect, the absence of any causal connection between the inadequacy and his alleged injury would have been just as fatal to his design defect claim. Thus, Plaintiff cannot establish he was prejudiced by an inability to present a design defect theory to the jury. *See Tompkin v. Philip Morris USA, Inc.*, 362 F. 3d 882, 902-03 (6th Cir. 2004) (if two claims are "virtually indistinguishable," plaintiff isn't prejudiced when only one is presented to jury); *see also Willis v. Royal Caribbean Cruises, Ltd.*, 77 F.4th 1332, 1339 (11th Cir. 2023)

---

[15] Plaintiff's brief points to an expert's statement that the device's "dosage" is set in an "arbitrary" manner such that "a patient in his 70s would get 70% of the electrical dose." OB19-20. Plaintiff's complaint says nothing about such a device feature, and he didn't amend his claim following discovery. Moreover, this can't be the defect underlying the claim as Plaintiff wasn't in his 70s when receiving ECT. *See* Dkt. 259 at 136 (Plaintiff born 1980). Plaintiff identifies no evidence on the dosage setting for a 34-year-old. Nor does he identify evidence that a dosage setting specifically caused his injury; he consistently claimed injury from ECT *generally*, asserting inadequate warnings impacted his treatment decision.

(absence of causation kills multiple claims); *cf. Varazo v. Keiser Corp.*, 754 F. App'x 918, 919 (11th Cir. 2018) (where "defect-related claims are merely repackaged versions of his failure-to-warn claim," the "design-defect claims fail for the same reasons the failure-to-warn claim fails").

Trying to escape the natural effect of the causation determination, Plaintiff argues that design defect claim would have produced different causation jury instructions because "the learned intermediary doctrine would not have applied to the design defect claim since Nebraska views the patient (not the physician) as the consumer." OB23. This argument fails for two independent reasons:

<u>First</u>, calling a warning inadequacy a design defect doesn't permit an end run around the learned intermediary doctrine. The doctrine's rationale applies equally to inadequate warnings repackaged as design defects. The doctrine recognizes that patient interests are best served when warnings go *exclusively* to doctors: "[A]s a medical expert," the "physician is in the best position to evaluate the often complex information provided by the manufacturer concerning [treatment] risks and benefits… and to make an individualized medical judgment, based on the patient's particular needs and susceptibilities, as to whether the patient should use the product." *Freeman*, 260 Neb. at 570. The doctrine seeks to avoid the dangers of providing highly technical warnings to laypeople. *See Plenger*, 11 Cal. App. 4th at 362 n.6 (patient "would have no way to evaluate" scientific warnings and, due to

"limited understanding," might "jeopardize[e] his life" by refusing necessary treatment).

This doctrine would become entirely toothless if any plaintiff could bypass it simply by characterizing warning inadequacy as a design defect. If pharmaceutical manufacturers must warn patients directly to avoid design defect liability, patients will become inundated with "complex" warnings that they lack the expertise to understand and that are more safely directed to their doctors. *Freeman*, 260 Neb. at 570.

Second, the doctor who uses the device on the patient—rather than the patient who consents to the doctor's use of the device—is the ordinary "user" for purposes of the expectations test.[16] "[O]nly… members of the medical profession" receive and interpret warnings of harms of prescription products; thus, doctors' expectations are the focus of the inquiry into whether prescription products may "caus[e] physical harm beyond that which could be contemplated." *Freeman*, 260 Neb. at 558, 570. The doctor's expectation, not the patient's, forms the relevant inquiry under the "consumer expectation test" because "the prescribing doctor… stands in the shoes of the ordinary consumer" and the "patient's expectations regarding the effects of a prescription drug are those related to him by his physician, to whom the

---

[16] The district court stated it "agree[d]" with Plaintiff on this issue but didn't explain its reasoning. *See* Dkt. 169 at 14.

manufacturer directs the warnings." *Carlin v. Superior Ct.*, 13 Cal. 4th 1104, 1118 (1996); *see also Cavanaugh v. Stryker Corp.*, 308 So. 3d 149, 156 (Fla. Dist. Ct. App. 2020) ("[T]he relevant expectations are those of the health care professional.").

## B. The court's own case management order didn't prevent it from granting summary judgment.

Plaintiff next proposes that the district court's own case management order—which required the parties to submit statements of facts alongside summary judgment motions—somehow stripped the court of authority to grant summary judgment.

Below, after Somatics moved for summary judgment,[17] Plaintiff objected to the absence of a separate statement of facts and then filed his own statement that he represented he'd "extracted" from the summary judgment filings. Dkt. 104. The district court thereafter issued an order stating it would "dispense with the requirements" of its case management order with respect to separate statements of facts. Dkt. 121.[18] The court also directed Somatics to "provide pinpoint citations to the summary judgment record" for "the statement of facts Plaintiff extracted from

---

[17] A former co-defendant, Elektrika, Inc. ("Elektrika"), moved for summary judgment on Plaintiff's design defect claim, Dkt. 93, and Somatics' motion adopted Elektrika's arguments, Dkt. 79. Elektrika settled before trial. Dkt. 151.

[18] Elektrika and Somatics had both moved for leave to file statements. Dkt. 113, 114. The court denied these motions in its order dispensing with its statement requirement. Dkt. 121.

Somatics' motion," *id*, which Somatics did, Dkt. 127. Plaintiff did not file an objection to the order dispensing with requirements.

Because Plaintiff didn't object to that order, he has waived his argument that the court lacked authority to dispense with its own requirements. *See Norelus v. Denny's, Inc*., 628 F.3d 1270, 1296 (11th Cir. 2010).

Moreover, Plaintiff's argument is meritless, as district courts have broad authority "to manage their own dockets." *Wells v. Gen. Dynamics Info. Tech. Inc*., 571 F. App'x 732, 734 (11th Cir. 2014) (district court didn't abuse discretion by excusing failure to timely file statement of material facts).

Plaintiff cites no authority prohibiting courts from relaxing requirements from prior case management orders, or suggesting that courts somehow lose authority to rule on summary judgment motions absent separate statements of facts. His citations miss the mark: *In re Smith* actually "decline[d] to exercise its discretion... to deny" a summary judgment motion purely because it was unaccompanied by a separate statement of facts, reasoning that the motion's "form sufficiently informed the Court of what facts were alleged to be undisputed." 231 B.R. 130, 133 (Bankr. M.D. Ga. 1999).[19] *Garland v. Advanced Med. Fund, L.P. II* only exercised its discretion to reject a summary judgment motion because it violated a local rule from the Northern District of Georgia regarding statements—rather than, as here, a case management

---

[19] The court ultimately denied the motion on the merits. 231 B.R. at 133.

order that the court could modify unilaterally. 86 F. Supp. 2d 1195, 1198 (N.D. Ga. 2000). *Mann v. Taser International, Inc*. involved the same Georgia local rule and only affirmed a discretionary rejection of a statement of facts in opposition to a summary judgment motion, not the motion itself. 588 F.3d 1291, 1302 (11th Cir. 2009). Moreover, *Mann* emphasized the "great deference" this Court affords to such matters of the district court's "discretion." *Id*.

Plaintiff also doesn't establish any harm from the district court's decision regarding the separate statement. *See Wells*, 571 F. App'x at 734 (decision to excuse failure to timely file statement was "harmless"). Plaintiff vaguely asserts it was "difficult for [him] to determine what specific facts defendants contended supported their specific arguments," OB14, but he identifies no particular factual ambiguity and certainly doesn't establish that the ambiguity impacted the decision on the design defect claim. Further, the summary judgment filings amply clarified the relevant facts, as evidenced by Plaintiff's ability to "extract" the separate statement that he prepared and that the court utilized. Dkt. 121. And, to the extent any party was harmed by the absence of *another* separate statement, that party was Somatics, which was unable to highlight additional facts beyond those *Plaintiff* selected for the "extracted" statement.

## C.    Plaintiff's burden-of-production argument fails.

Plaintiff next argues that the district court erred "*[p]rocedurally*" because Somatics failed to "cite[]" sufficient "evidence," OB18 (emphasis in original), to meet a summary judgment burden under *Clark v. Coats & Clark, Inc*., 929 F.2d 604 (11th Cir. 1991).  This argument fails for three independent reasons.

<u>First</u>, Plaintiff waived the argument by failing to raise it in his summary judgment opposition.    *See Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001).

<u>Second</u>, the argument is meritless because a court may grant summary judgment even *sua sponte* where the evidentiary record is complete.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence."); *Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003) (a party has adequate notice of sua sponte summary judgment where the evidentiary record is complete and summary judgment motions are before the court).

<u>Third</u>, this Court has repeatedly rejected Plaintiff's tortured reading of *Clark* and confirmed that, to satisfy its summary judgment burden, a movant need not do "more" than "point out to the district court that there is an absence of evidence to support the nonmoving party's case"; the movant "need not support its motion with

affidavits or other similar material *negating* the opponent's claim." *Willis v. Royal Caribbean Cruises, Ltd*., 77 F.4th 1332, 1336 n.7 (11th Cir. 2023) (quoting *Celotex Corp.*, 477 U.S. at 323 (emphasis in original)); *accord Rice-Lamar v. City of Ft. Lauderdale, Fla*., 232 F.3d 836, 840 (11th Cir. 2000). Here, Somatics met its burden by "point[ing] out" that Plaintiff had failed to offer evidence regarding an ordinary user's expectations—a required element of Plaintiff's burden of proof on his design defect claim. *See Freeman*, 260 Neb. at 558 (relevant inquiry is whether product "has the propensity for causing physical harm beyond that which would be contemplated by *the ordinary user or consumer*").

That Somatics and Plaintiff disagreed on whether the ordinary-user inquiry focused on the patient or the doctor, and that the district court ultimately sided with Plaintiff, has nothing to do with whether Somatics met its burden. The summary judgment motion argued that, "whether the 'ordinary users' of medical devices are prescribing physicians or their patients, … *in either event*, [Plaintiff] has not developed evidence regarding user expectations." Dkt. 93 at 20. Plaintiff identifies no authority for the suggestion that a movant cannot argue in the alternative, or that a movant fails to meet its burden merely because a court relies on different reasoning when granting the motion.

**A. Plaintiff failed to create a triable issue on the design defect claim.**

Plaintiff faced a steep hurdle in showing that the device at issue was more dangerous than an ordinary user would expect, given that the consent form Plaintiff signed confirmed that doctors and patients alike are aware ECT can cause both *death* and permanent memory loss. Dkt. 111-2. Plaintiff identifies no case in which a court found the user-expectations test satisfied where the user expected an *even greater* danger (death) than the allegedly-occurring injury (nonfatal memory loss).

The district court correctly found that, even if the patient is the "ordinary user," Plaintiff didn't offer sufficient evidence. All the evidence and arguments Plaintiff offered below focused on his own expectations; there was nothing more to indicate the expectations of an objective "ordinary user." *See Cates v. Zeltiq Aesthetics, Inc*., 73 F.4th 1342 (11th Cir. 2023) (plaintiff can't survive summary judgment through evidence of his "subjective[]" expectations; "the consumer expectations test is an objective test").

To satisfy the user-expectations test, a plaintiff must offer evidence about what users beyond the plaintiff would anticipate. For example, in *Crawford v. ITW Food Equipment Group*, *LLC*, the plaintiff was injured by a saw designed without a protective "guard" for the blade. 977 F.3d 1331, 1336 (11th Cir. 2020). The plaintiff offered expert testimony explaining that ordinary workers—not just the plaintiff subjectively—would fail to notice the guard's absence. *See id.* ("a human factors

engineer" testified about "how workers can fail to see objects that are not the focus of their attention," a phenomenon called "inattentional blindness").

Plaintiff cites *Rahmig v. Mosley Machinery Co.*, in which the plaintiff suffered workplace injuries while cleaning a machine with a guillotine-style blade. 226 Neb. 423, 425 (Neb. 1987). The record showed that the machine's controls could be "locked in the 'up' position," at which time *all* the workers—not just the plaintiff subjectively—"understood that the machine was 'safe' and that the blade-arm would not descend." *Id.* at 428. An expert testified that a lock "should have" been there to keep the blade up "but there was none." *Id*. at 432. The expert further testified that ordinary users would be "likely... unaware" of that danger. *Id*. *Rahmig* highlights the evidence missing from this case: testimony about what ordinary users *beyond the plaintiff* would have "understood" or been "unaware" of. *Id*. at 428, 432.

The necessary user-expectations evidence is unavoidably case-specific. Plaintiff therefore cannot rely on *Hancock v. Paccar, Inc.*, which involved a freak accident in which damage to a vehicle's bumper somehow "locked" the vehicle's steering wheel, causing a fatal crash. 204 Neb. 468, 471 (1979). Extensive evidence about the unusual facts led the court to conclude that an ordinary user wouldn't expect the bumper damage to impact the wheel. Here, unlike in *Hancock*'s odd scenario, any gap between risk expectations and reality is narrow: Ordinary users understand ECT can affect neurocognitive function and cause permanent memory

loss, because consent forms tell them that. *See* Dkt. 111-2 (consent form warning of permanent memory loss).

Plaintiff argues he met his user-expectations burden through "evidence from various experts showing Somatics knew or should have known ECT could cause brain injury." OB22. Plaintiff didn't make this argument below and therefore waived it. Moreover, any such evidence bears on *Somatics'* expectations, not an ordinary user's. Whether the ordinary user is the patient or doctor, it is not the manufacturer. Similarly, Plaintiff cannot survive summary judgment based on the evidence purportedly indicating Somatics didn't perform "studies" regarding its device; he cannot explain how this relates to *user expectations*.

Plaintiff also argues he can survive summary judgment based on vague references to "testimony from treaters" and "from [Plaintiff's] parents." OB22. He didn't argue this below and has thus waived it. Moreover, even on appeal he does not describe the specific testimony or how it bears on user expectations. Arguments this underdeveloped are waived. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007). In any event, evidence of Plaintiff's or his parents' particular subjective expectations, based on their communications with physicians, do not suffice because the expectations test is *objective*.

Plaintiff further points to the expert testimony that the "dosage" feature of Somatics' device means "a patient in his 70s would get 70% of the electrical dose."

OB19-20.  As noted above, Plaintiff wasn't 70 at time of treatment and has not identified evidence remotely linking this feature to his injury.  Moreover, Plaintiff points to no evidence about what knowledge the ordinary user (patient *or* doctor) has about device dosage, let alone how that dosage-related knowledge impacts their expectations about potential harms of using the device.[20]

Plaintiff misplaces his reliance on *Freeman*, which was decided on the pleadings and therefore doesn't address the evidentiary showing required for summary judgment.  Moreover, the *Freeman* plaintiff alleged that the product at issue lacked warnings of "life-threatening" risks while marketed as a treatment for acne.  *Freeman*, 260 Neb. at 568.  Here, by contrast, ECT is prescribed for life-threatening mental health issues—including, as here, severe suicidal depression—and doctors and patients are aware of the risk of life-threatening side effects, including "mortality" itself, as Plaintiff's signed consent form states.  Dkt. 111-2.[21]

Lastly, Plaintiff finds no support in *O'Neil v. Somatics, LLC*, 2022 WL 4611938 (D.N.H. Sept. 30, 2022).  *O'Neil* didn't assess user-expectations evidence because it applied the law of New Hampshire, which uses a risk-utility balancing

---

[20] Further, as noted, Plaintiff wasn't 70 when he got ECT, and he has identified no evidence that the particular dosage he got (as opposed just generally getting ECT) caused him any injury.

[21] Plaintiff's citation to *Jay v. Moog Auto., Inc*., 264 Neb. 875 (2002), is similarly unavailing. The court didn't address whether the plaintiff presented sufficient evidence of ordinary user expectations because the defendant's didn't raise the issue.

test rather than the user-expectations test applicable in Nebraska. *See Kelleher v. Marvin Lumber & Cedar Co*., 152 N.H. 813, 831 (N.H. 2005).

## VI. The district court properly merged the negligence claim.

Finally, Plaintiff challenges the district court's application of Nebraska's "merger" doctrine to his negligence claim. Merger here was proper. In the alternative, Plaintiff's negligence claim fails due to the jury's causation finding.

### A. Merger was proper.

Nebraska law authorizes "merging theories of recovery" that are based on the same "defect," rather than asking juries to make separate (and potentially "inconsistent") findings on each theory. *Freeman*, 260 Neb. At 572-74. Under Nebraska's "single theory approach," the court deems "merged" claims that rest on the same one of "the three basic types of product defect claims: design, manufacturing, and warning defect claims." *Id*. at 573. "Instead of focusing on doctrinal tort categories *such as negligence or strict liability*, … the definition of 'defect' is the important issue." *Id*.[22] The Nebraska Supreme Court has explicitly confirmed that the merger doctrine applies to strict liability and negligence claims based on a warning defect:

> [T]wo or more factually identical failure-to-warn claims should not be submitted to the trier of fact in the same case under different doctrinal labels.... [W]hether "*strict liability,*" "*negligence*," or "implied

---

[22] *See also Stahlecker*, 266 Neb. at 607 (merging claims resting on same defect theory).

warranty of merchantability," [submitting claims separately] would generate confusion and may well result in inconsistent verdicts.

*Freeman*, 260 Neb. At 573-74.

Below, Plaintiff's counsel acknowledged that his negligence claim (like his strict liability claim) rested on a purported warning defect, including a failure to test *that produced inadequate warnings*:

> [PLAINTIFF'S COUNSEL]: The negligence claim, Your Honor, is failing to act as a reasonable manufacturer would have done under the circumstances… *by failing to warn, failing to provide warnings*.
>
> THE COURT: Failure to warn, that's our strict liability claim….
>
> [PLAINTIFF'S COUNSEL]: Both of them, you can have one under negligence. You can have one under strict liability. Failing to conduct any clinical trials… that's a big part…
>
> THE COURT: Wouldn't that only cause injury if it… resulted from a failure to warn? …
>
> [PLAINTIFF'S COUNSEL]: It's part of a negligence claim that… informs on the conduct of the company and informs on *whether the company was negligent in failing to warn*, because they failed to investigate properly in order to inform themselves of the risk. And, therefore, *because they failed to inform themselves of the risk, they did not provide adequate warnings*.

Dkt. 208 at 42-43.

The district court then properly held that submitting both warning-defect claims separately created a "[l]ikelihood" of "jury confusion" and "problems when it comes to instructing the jury," as well as a risk of "inconsistent verdicts." Dkt. 258 at 14.

Plaintiff now challenges what he refers to as the "dismissal" of his negligence claim. But the court merged rather than dismissed the claim. *See* Dkt. 258 at 14; Dkt. 262 at 235 (finding negligence claim "covered under the existing claim").[23]

Plaintiff identifies no authority for his argument that merger cannot apply to strict liability and negligence claims. To the contrary, *Freeman* specifically endorses merging the two. *See* 260 Neb. At 573-74 ("[W]hether "*strict liability,*" "*negligence*," or "implied warranty of merchantability," [submitting claims separately] would generate confusion and may well result in inconsistent verdicts."); *id*. at 573 ("Instead of focusing on doctrinal tort categories *such as negligence or strict liability*, … the definition of 'defect' is the important issue.").[24]

To be sure, *Freeman* recognizes that, "[a]side from pleading theories of recovery under strict liability for specific product defects, a plaintiff may assert a theory of recovery based on negligence." *Id*. at 577. That is consistent with *Freeman's* earlier statement: A plaintiff may assert both negligence and strict liability claims, but under Nebraska law they should be merged when they rest on the same defect. *Id*. at 572-74.

---

[23] Because the court merged rather than dismissed the claim, Plaintiff finds no support in *Jefferson Fourteenth Assocs. v. Wometco de Puerto Rico, Inc*., 695 F.2d 524, 527 (11th Cir. 1983).

[24] Plaintiff also cites *Jay v. Moog Auto., Inc*., but *Jay* didn't address merger at all; neither party raised the issue. 264 Neb. 875 (2002).

Plaintiff argues his negligence claim "was not duplicative of his strict liability warning claims" because "it also included a negligent failure to test claim." OB11. But Nebraska has never recognized an independent cause of action for negligent failure to test, as the district court recognized. Dkt. 258 at 15. Courts across the country agree that no such claim exists. *See, e.g.*, *Branham v. Ford Motor Co.*, 390 S.C. 203, 210 (2010); *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 38.[25] Plaintiff cites only cases in which courts considered a failure-to-test theory as a *component* of a negligence claim for a design, manufacturing, or warning defect. *See Jay*, 264 Neb. at 880 (claim for "negligence…in the design"); *Freeman*, 260 Neb. At 555 (claim for negligence in "design," "manufacture," and "warnings"); *Hancock*, 204 Neb. At 471 (claim for "negligen[ce] with regard to the design"); *Hoelck v. ICI Americas, Inc*., 7 Neb. App. 622, 624 (1998) (claim for negligence "[i]n failing to adequately warn of risks").[26]

---

[25] *Accord, e.g.*, *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1, 19 (1998); *West v. Broderick & Bascom Rope Co*., 197 N.W.2d 202, 213 (Iowa 1972); *Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534, 541 (2003), *aff'd*, 584 Pa. 120 (2005); *Valentine v. Baxter Healthcare Corp.*, 68 Cal. App. 4th 1467, 1485 (1999); *Adams v. G.D. Searle & Co*., 576 So. 2d 728, 730-31 (Fla. Dist. Ct. App. 1991); *Patton v. Country Place Condo. Ass'n,* 2000 WL 33728374, at *4 (Ill. App. Ct. July 7, 2000); *Fane v. Zimmer, Inc*., 927 F.2d 124, 130 (2d Cir. 1991); *Villegas v. Deere & Co*., 135 F. App'x 279, 281 (11th Cir. 2005).

[26] Plaintiff stresses that *Hancock* involved no warning defect. But the failure-to-test theory linked with a *design* defect claim. 204 Neb. at 471.

Because testing can alert a manufacturer to a defect, failure-to-test evidence can support a claim for design, manufacturing, or warning defects.  But, while "the duty to warn may well *encompass* a duty to test a product to discover defects," failure-to-test is not a standalone cause of action because it "cannot, standing alone, cause the resulting injury." *Burley*, 2007 S.D. 82, ¶ 38 (emphasis in original); *accord Branham*, 390 S.C. at 210 ("no separate 'failure to test claim'" because, absent a defect, "failure to test cannot be the proximate cause of an injury").  As the district court recognized, here, "[i]f the failure to test doesn't result in warning defect, then it didn't have any impact." Dkt. 258 at 15.  Accordingly, "submission to the jury of negligent failure to test or to investigate as a separate legal theory in addition to failure to warn would be redundant, would generate confusion, and would be inappropriate under *Freeman*." Dkt. 250 at 5.

## B.    Lack of causation is fatal to the negligence claim.

In addition to having been properly merged, the negligence claim would make no difference because of the jury's finding on causation.  A causal relationship between warning-inadequacy and injury is just as necessary for a negligence claim as a strict liability claim.  *See Stahlecker v. Ford Motor Co.*, 266 Neb. 601, 608 (2003).  Even if Plaintiff had been able to establish that negligent conduct by Somatics—including a failure to test—had produced inadequate warnings, his inability to prove causation would still bar recovery.  As Plaintiff's own counsel

argued to the district court, "strict liability... is an *easier* path to prove liability than negligence is," Dkt. 208 at 40, and Plaintiff failed to convince the jury even under that easier path.

Plaintiff vaguely states that, absent merger, he could have offered "different testimony." OB29. But he doesn't identify what testimonial evidence was excluded due to the merger. Arguments this underdeveloped are waived. *See Astrue*, 495 F.3d at 1287 n.13. And Plaintiff presented evidence regarding testing anyway. *E.g.*, Dkt. 260 at 218-19.

Plaintiff also proposes that causation jury instructions would have differed somehow if the jury had been asked to reach separate findings about a negligent failure to test. But Plaintiff doesn't explain how, under the facts of this case, he could prove a causal link between that failure and his injury without evidence of a change in doctor conduct. More testing might prompt stronger warnings, but those stronger warnings could only impact Plaintiff's treatment if they altered the conduct of the only person who received them—Plaintiff's doctor. *See Freeman,* 260 Neb. at 570. Moreover, even if the jury instructions on doctor conduct would differ (which they wouldn't), the record contains overwhelming evidence of numerous breaks in the causal chain that had nothing to do with doctor conduct. *See supra* Section I(B). Further, as discussed above, while failure-to-test evidence might be

relevant to a failure-to-warn claim, failure to test is not a standalone claim requiring independent jury instructions.

## CONCLUSION

For the reasons above, the Court should affirm.


Dated: June 17, 2024

Respectfully submitted,

/s/ *Jonathan M. Freiman*
Jonathan M. Freiman, EDF# 029184547
Ariela C. Anhalt, EDF# 532750818
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510
(203) 498-4400
jfreiman@wiggin.com
aanhalt@wiggin.com

Susan J. Cole, BCS, EDF# 010171766
MG+M THE LAW FIRM
701 Brickell Avenue, Suite 2000
Miami, FL  33131
(305) 537-3419
scole@mgmlaw.com

*Attorneys for Defendant-Appellee*
*Somatics, LLC*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

### 1. Type-Volume

The foregoing brief of Defendant-Appellee complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Eleventh Circuit Rule 32(g)(1) because it contains 12,903 words as determined by the word-count function of Microsoft Office 365, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Eleventh Circuit Rule 32(4).

### 2. Typeface and Type-Style

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, 14-point, Times New Roman typeface using Microsoft Office 365.


Dated: June 17, 2024        By:    _/s/ Jonathan M. Freiman_
                                             Jonathan M. Freiman